GILBERT, P.J.
When the retroactive application of a statute gives a trial court discretion to reconsider imposing a lower sentence than one previously imposed, it is customary for an appellate court to remand the case to the trial court. But not always.
A jury convicted Christian Almanza of first degree murder ( Pen. Code, §§ 187, subd. (a), 189 )[1] and assault with a firearm (§ 245, subd. (b) ). The jury found gang *211 enhancement allegations true on both counts. (§ 186.22, subd. (b)(1)(C).) On the murder charge, the jury found a principal personally and intentionally discharged a firearm causing death. (§ 12022.53, subd. (d).) The trial court found Almanza suffered two prior strike convictions within the meaning of the three strikes law (§ 667, subds. (a)-(i) ) and one prior prison term (§ 667.5, subd. (b) ).
The trial court sentenced Almanza to an aggregate term of 137 years to life, including 25 years to life for the firearm enhancement imposed pursuant to section 12022.53, subdivision (d). The court stayed two other firearm enhancements (§ 12022.53, subd. (b) & (c) ) pursuant to section 654.
Our Supreme Court granted review of our opinion affirming the judgment ( People v. Almanza (Sept. 12, 2017, B270903) 2017 WL 4003064 [nonpub. opn.] ) and remanded the matter to us with directions to vacate our opinion and reconsider the cause in light of Senate Bill No. 620. (People v. Almanza (Nov. 29, 2017, S244789).)
We affirm. We do not remand to the trial court. To do so would be an idle act.
FACTS
Robert Hernandez and his brother, Jesus, were members of the Big Hazard criminal street gang. Jesus got into a dispute with a Big Hazard "shot-caller," Robert Gonzalez. As a result, Jesus shot and killed Gonzalez. The Big Hazard leadership gave a "green light" to kill Jesus and members of his family, including Hernandez. A Big Hazard member who fails to carry out a green light is subject to discipline for failure to follow orders.
Almanza was a Big Hazard gang member. On May 3, 2014, he was at a barbeque attended by other members of his gang. Hernandez and Anthony Rivas were at the barbeque. Almanza gave Hernandez money to buy beer and Hernandez left for the store. While Hernandez was gone, Almanza received a phone call from gang leader Victor "Grizzly" Barrios, advising him that Hernandez was in trouble with the gang. Barrios said that Hernandez had pulled a gun on another Big Hazard member for writing graffiti on a wall.
Almanza and Rivas left the barbeque to confront Hernandez at the store. On the way, they stopped by Rivas's house and picked up a .38 handgun. When they arrived at the store, Almanza went inside to see if Hernandez was there. Almanza saw Hernandez and spoke to him briefly. Almanza left the store with Hernandez behind him. When Hernandez came into the store's parking lot, Rivas shot Hernandez twice, killing him. A bystander, Americo Beltran, was struck in the thigh by a stray bullet.
Rivas gave the gun to Almanza. Almanza took the gun to another gang member's house where he left it.
Surveillance Videos
Surveillance cameras in and outside the store captured the following:
Almanza and Rivas were walking toward the store. Rivas was several seconds behind Almanza. Rivas appeared to be holding a shiny object in his hand.
Almanza approached the entrance to the store and looked around before entering. He spoke briefly with Hernandez in the store. Almanza walked out of the store with Hernandez immediately behind him.
In the meantime, Rivas entered the store's parking lot. Rivas made a gesture with his hand that Officer Alejandro Feria opined was consistent with someone racking a handgun, but a handgun could not be discerned from the video. Rivas stepped out of the video before the shots were *212 fired. Hernandez fell to the ground. Almanza ran away from the store with a shiny object in his hand.
Cell Phone Texts
On May 3, between 11:02 p.m. and 11:44 p.m., Almanza made outgoing calls to Barrios, the gang leader who warned him about Hernandez.
On May 4, starting at 12:36 a.m., Almanza received text messages stating: "Oh my God. Why? You are so dumb. Leave. Hide. Are you okay? Where are you?" Almanza responded, "I just hope they don't have me on camera" and "I'm sorry Gorda."
At 3:49 a.m., Almanza sent a text message, "I'm good so far, but if I do get busted, tell Diana." Later Almanza texted, "I fudge [sic ] up. And what can I do? Just hope everything goes good." At 6:32 a.m., Almanza texted the same person, "Still here.... Me and [Rivas] drinking. LOL." The person responded, "It's going to get hot out there, babe."
At 1:11 p.m., Almanza texted, "Babe, just got a call. The video blank. They didn't see me. Thank God." Six minutes later Almanza texted, "Gorda. The video at the store was blank. I'm okay. I'm not on it. Thank God."
On May 11, at 9:58 a.m., Almanza texted, "I did some shit that I got to get out of here. I'm just waiting to do one big transa [sic ] and I'm gone." Two minutes later Almanza texted, "Nobody knows I'm leaving for good, but I'm just gonna ask you once. You wanna leave with me, but nobody could know. R-E-A I'm serious."
Gang Testimony
Los Angeles Police Officer Brian Cook testified as a gang expert. The Big Hazard and the Krazy Ass Mexican gangs were his primary responsibility. The Big Hazard gang has approximately 360 members. Cook has met more than 80 of them.
Big Hazard's primary activities include murder, attempted murder, voluntary manslaughter, assault with deadly weapons, robbery, burglary, felony vandalism and criminal threats. The gang also is involved in narcotics sales.
Cook testified that Rivas is a Big Hazard gang member. Cook has not personally met Rivas. But Cook identified Big Hazard gang tattoos in a photograph of Rivas.
Cook testified that Almanza is also a gang member. Cook has had numerous personal contacts with Almanza. Almanza admitted to Cook that he is a Big Hazard gang member. He has gang tattoos.
Cook testified that Hernandez was a member of the Big Hazard gang. Cook did not know Hernandez personally, but saw his body at the crime scene. Hernandez's body had Big Hazard tattoos.
The prosecution gave Cook a hypothetical based on the facts of the case. Cook opined the shooting was done for the benefit of, at the direction of, or in association with a criminal street gang.
The prosecution introduced evidence of three predicate offenses.
A certified court docket showed Ryan Zepeda was convicted of two counts of attempted murder with a gang enhancement. Cook testified he had numerous personal interactions with Zepeda during which he admitted his membership in the Big Hazard gang.
Hernandez's brother, Jesus, was convicted of the murder of Robert Gonzalez, the murder that led to the Hernandez family being "green lighted." Cook's knowledge of the murder was based on investigative reports and discussions with the investigator and prosecutor.
*213 Cook testified he personally knew Victor Barrios and knew him to be a member of the Big Hazard gang. Later in the trial Detective Miguel Barajas testified that he served a search warrant on Barrios's residence. He found narcotics, a scale, pay and owe sheets and gang paraphernalia. Barrios was convicted of possession of narcotics for sale.
Confession
After the shooting, Almanza voluntarily went to the police station. He was advised of his rights and agreed to talk to the police. The interview was recorded. After giving three false statements, Almanza admitted to his involvement in the murder.
DISCUSSION
I**
V
On October 11, 2017, the Governor signed Senate Bill No. 620 into law, effective January 1, 2018. The bill amends subdivision (h) of section 12022.53. The amended subdivision provides: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2.)
The People concede that Senate Bill No. 620, as a statute that gives the trial court discretion to impose a lower sentence, applies retroactively. ( People v. Francis (1969) 71 Cal.2d 66, 75-76, 75 Cal.Rptr. 199, 450 P.2d 591.) The People argue, however, that remand to the trial court is not appropriate under the facts of this case because the record shows the trial court "would not ... have exercised its discretion to lessen the sentence." ( People v. Gutierrez (1996) 48 Cal.App.4th 1894, 1896, 56 Cal.Rptr.2d 529.)
The People point out that the trial court could have imposed concurrent sentences for murder and assault with a firearm. Instead, the court imposed consecutive sentences. Thus, the People conclude the court exhibited no desire to be lenient with Almanza.
Almanza argues that it would not be a per se abuse of discretion to strike the firearm enhancements. But the question is not whether it would be a per se abuse of discretion. Instead, the question is whether there is any reasonable probability the trial court would exercise its discretion to strike the enhancements so as to justify remanding the matter.
Almanza cites the concurring opinion of Mosk, J. in People v. Deloza (1998) 18 Cal.4th 585, 601, 76 Cal.Rptr.2d 255, 957 P.2d 945. The concurring opinion states that a sentence of 111 years is shocking and absurd and serves no rational legislative purpose. Justice Mosk recommended the Legislature convert multicentury sentences to life or even life without the possibility of parole. ( Id. at p. 602, 76 Cal.Rptr.2d 255, 957 P.2d 945.)
Even if the trial court here were to strike all of the firearm enhancements, it would reduce Almanza's minimum term from 137 years to 112 years. A 137-year minimum term is no more or less absurd than a 112-year minimum term. Justice Mosk makes a cogent point. ( People v. Deloza , supra , 18 Cal.4th at pp. 600-602, 76 Cal.Rptr.2d 255, 957 P.2d 945.) Nevertheless, Deloza does not hold that century-plus sentences are unconstitutional.
*214 We agree with the People. There is no reasonable probability the trial court would exercise its discretion in favor of Almanza. A jury convicted Almanza of a cold-blooded, premeditated murder committed for the benefit of a criminal street gang. His record includes two prior strikes and a prior prison term. If the trial court were inclined to be lenient, it would have made the sentence for assault concurrent with the sentence for murder. ( People v. Gamble (2008) 164 Cal.App.4th 891, 901, 79 Cal.Rptr.3d 612 [idle act to remand where record demonstrates trial court would not have exercised discretion even if it believed it could do so]; see also People v. Gutierrez (1996) 48 Cal.App.4th 1894, 1896, 56 Cal.Rptr.2d 529 ; People v. Bravot (1986) 183 Cal.App.3d 93, 98, 227 Cal.Rptr. 810.)
The judgment is affirmed.
We concur:
YEGAN, J.
TANGEMAN, J.
Certified for Partial Publication.*

Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [ [/] ].

All statutory references are to the Penal Code.

See footnote *, ante .